UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

Endicott Interconnect Technologies, Inc., *et al.,* [1]

                             Debtors.

            Case No. 13-61156
            Chapter 11 Case
            Main Case
            Joint Administration Requested

_____

## AFFIDAVIT OF DAVID W. VAN ROSSUM IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

STATE OF NEW YORK    )
COUNTY OF BROOME   )  ss.:

     David W. Van Rossum, being duly sworn, hereby deposes and says:

     1.     I am the chief restructuring officer, and chief financial officer, of Endicott Interconnect Technologies, Inc. ("EIT") and EI Transportation Company, LLC ("Transportation"), the debtors and debtors in possession in the captioned chapter 11 cases (collectively, the "Debtors"). In my capacities as chief restructuring officer and chief financial officer, I am familiar with all aspects of the Debtors' businesses and operations.

     2.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" pleadings and applications (each a "First Day Pleading"). The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Endicott Interconnect Technologies, Inc. (2350)) and EI Transportation Company, LLC (4961).

2165168.3

3.      I submit this Affidavit in support of the chapter 11 petitions and First Day

Pleadings filed by the Debtors on July 10, 2013[2].  I am familiar with the contents of each First

Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in

each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with

minimal disruption or loss of productivity and value; (b) constitutes a critical element to

achieving a successful restructuring of the Debtors; and (c) best serves the Debtors' estates and

creditors' interests.

4.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon

my personal knowledge, my review of relevant documents, my opinion, my experience and

knowledge of the Debtors' operations and financial conditions, or are based upon knowledge of

employees of the Debtors reporting to me that are derived in the course of his/her duties.  If I

were called upon to testify, I could and would testify to the facts set forth herein.  I am

authorized on behalf of the Debtors to submit this Affidavit.

5.      Part I of this Affidavit describes the Debtors' businesses and the circumstances

surrounding the filing of their chapter 11 petitions.  Part II of this Affidavit sets forth the relevant

facts in support of the various first day applications and motions filed by the Debtors

contemporaneously herewith.

---

[2] All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant
First Day Pleadings.

2165168.3 7/10/2013

## PART I - BACKGROUND

6 On July 10, 2013 (the "Petition Date"), the Debtors filed separate, voluntary petitions for relief under chapter 11 of title 11 of the United States Code, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York (the "Court").

7. The Debtors remain in possession of their respective assets and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these cases and, as of the date hereof, no official committees have been appointed or designated.  Concurrently herewith, the Debtors have filed motions seeking the joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### A. EIT

8. EIT is a closely-held New York corporation with a principal office and place of business located at 1093 Clark Street, Endicott, New York 13760.  EIT was formed in 2002 as the successor to IBM Corporation's microelectronics division in Endicott, New York (formed in 1966).  EIT is a world-wide supplier of advanced electronic packaging solutions for industrial, commercial, medical, government and telecommunications customers.  It designs and fabricates printed circuit (PC) boards and advanced flip chip and wire bond semiconductor packages, including systems-in-packages, offers full turnkey services for PC board and integrated circuits assembly and tests and provides systems integration.  Its flip chip package products are widely used in applications such as avionics and controls, medical devices, electronic warfare, network-centric systems, intelligence and surveillance systems, anti-counterfeiting and anti-tamper

3

technologies, space and airborne systems, sensor systems, unmanned systems, radio frequency systems and homeland security.

9.      EIT designs, manufactures, tests and delivers printed circuit board fabrications, semiconductor packaging fabrications and complex assembly products from its facility in Endicott, New York.  Its customers include IBM, Cadence, Cisco, Boeing, Northrop Grumman, Raytheon, St. Jude Medical, GE Medical, Harris, DE Shaw and the U.S. Department of Defense.

10.      As of the Petition Date, EIT was owned by Judith Matthews, the Estate of James F. Matthews, James T. Matthews, Douglas G. Matthews, John W. Matthews, Robert P. Matthews and Lawrence Davis (collectively, the "Shareholders").  EIT, in turn, is the corporate parent of four (4) subsidiary corporations:  Transportation, Endicott Medtech, Inc., EI Technologies UK, Ltd. and EI Asia Pacific, Ltd.  Transportation also filed a voluntary chapter 11 petition for relief on July 10, 2013.  Transportation, Endicott Meditech, Inc. and EI Asia Pacific, Ltd. are not currently operating and do not have significant assets.  Two sales employees residing in England are paid their salaries and commissions through a payroll account established by EI Technologies UK, Ltd.

11.      EIT currently has approximately 579 active employees.  Approximately 570 employees are full-time and nine (9) are part-time.  Approximately 72% of the employees are hourly wage earners and the remaining 28% are salaried personnel.

12.      As of the Petition Date, EIT is indebted to secured creditors Integrian Holdings, LLC ("Integrian")[3], as successor in interest to PNC Bank, National Association ("PNC"), M&T Bank ("M&T"), the holder of a contingent secured claim and William and David Maines ("Maines", and together with Integrian and M&T, the "Prepetition Secured Lenders"), pursuant to the following transactions and documents (collectively, the "Prepetition Loan Documents"):

---

[3] Integrian is owned by James T. Matthews, who is also a minority owner of EIT.

2165168.3 7/10/2013

a.    On February 10, 2012, EIT executed and delivered a Revolving Credit Note and Revolving Credit and Security Agreement (together with all related transaction documents, the "PNC Revolver") to PNC, pursuant to which PNC made a line of credit available to EIT in the amount of $50,000,000.00.  Repayment of the amounts loaned under the PNC Revolver was secured by a first position security interest and lien (the "PNC Lien") upon substantially all of EIT's assets (the "Prepetition Collateral") and was guaranteed by Transportation, among other entities.  On March 6, 2013, Integrian as successor in interest to PNC, obtained a complete assignment of the PNC Revolver by paying PNC the full amount of the outstanding balance due under the PNC Revolver in the amount of $3,954,385.54 and PNC assigned all of its right, title and interest under the PNC Revolver to Integrian.  As of the Petition Date, EIT's obligations owed to Integrian as successor in interest to PNC under the PNC Revolver included approximately $4,981,262.19 in unpaid principal, together with accrued interest in the amount of $1,149.42.

b.    On March 13, 2013, certain members of the Matthews family[4] borrowed $6,405,000.00 from M&T.  On that same day, the Matthews loaned the sum of $6,405,000.00 to Integrian pursuant to a Term Note and Credit Agreement dated March 13, 2013.  Integrian, in turn, loaned the sum to EIT pursuant to a Term Note and Credit Agreement dated March 18, 2013 (the "Integrian Term Note").  The loan to the Mathews was guaranteed by, among others, EIT and Transportation, and EIT granted to M&T a security interest covering all of the Prepetition Collateral.  A portion of the funds totaling $1,405,000.00 were paid to M&T to satisfy EIT's obligations under certain equipment leases, and the balance of $5,000,000.00 was used by EIT as working capital.  Repayment by EIT of the $6,405,000.00 loaned under the Integrian Term Note is secured by the first position security interest granted to Integrian, as successor in interest to PNC.[5]  As of the Petition Date, EIT's obligations under the Integrian Term Note included approximately $6,084,750.00 in unpaid principal, together with accrued interest in the amount of $17,113.36 and certain fees, expenses and other amounts due.

c.    On June 13, 2013, Maines loaned the sum of $5,000,0000.00 to EIT for working capital purposes pursuant to a Term Note (the "Maines Term Note"), Security Agreement and Restated and Amended Subordination Agreement (the "Subordination Agreement") dated as of June 13, 2013 (collectively, the "Maines Loan Documents").  Repayment of the Maines Term Note is secured by a second position security interest and lien covering all of EIT's personal property.  Under the terms of the Restated and Amended Subordination Agreement, repayment of the amounts due Integrian under the PNC Revolver are subordinated to the repayment of the Maines

---

[4] James T. Mathews, Douglas G. Mathews, Theresa Mathews, John W. Mathews and Robert P. Mathews (collectively, the "Mathews").
[5] Any funds paid by EIT under the Integrian Term Note will be paid directly to M&T.

2165168.3 7/10/2013

Term Note. As of the Petition Date, EIT's obligations under the Maines Loan Documents included $5,000,000.00 in unpaid principal, together with accrued interest in the amount of $9,895.83 and certain fees, expenses and other amounts due.

13.    In addition to the foregoing, as of the Petition Date, EIT owed approximately

$35,000,000.00 on an unsecured basis to non-insider trade creditors, and approximately

$32,335,131.27 to the Shareholders in connection with unsecured loans made by them to EIT

since 2002.  In addition, EIT is the tenant under a Real Property Lease Agreement with Huron

Real Estate Associates, LLC ("Huron") dated January 1, 2008 pursuant to which it owes Huron

$4,494,733.33 for pre-petition rental payments, utility payments and other charges[6].  EIT is also

the defendant in several vendor collection actions, including an action commenced by Canal Air,

LLC to collect $11,511,940.00 under EIT's guarantee of an obligation owed to Canal Air, LLC

by Transportation (discussed below).  In addition, as of the Petition Date, certain funds totaling

$232,979.42 deposited at PNC and an account receivable owed to EIT by IBM in the amount of

$507,000.00 were subject to Writs of Execution issued by Computer Craft, Inc. in connection

with a judgment obtained by that creditor in the New Jersey Superior Court.  No other property

of EIT is in the possession or custody of any custodian, public officer, mortgagee, pledgee,

assignee of rents or secured creditor or agent for any such person.

14.    Since 2009, EIT's revenues have declined steadily from a high of $414 million in

2008 to projected revenues of less than $100 million for 2013 as a result of increased

competition from foreign circuit board manufacturers, a reduced number of contract

opportunities with the federal government due to the sequestration and the general, sustained

downturn in the national and international economies.  As a result, EIT has incurred operating

losses of nearly $100 million during the period of 2009-2012.

---

[6] Certain members of the Matthews family own a non-controlling interest in Huron.

2165168.4 7/10/2013

15.    During the past four years, EIT has explored all available options in an effort to reorganize its financial affairs, including seeking refinancing, new capital contributions and the sale of some assets and/or all of its assets.  EIT engaged two business brokerage firms, J.P. Morgan Securities LLC and Feather Lane Group, LLC, which undertook extensive efforts to market EIT's assets and business operations for sale.  Although several potential financial and/or strategic purchasers expressed interest in acquiring EIT's assets and operations, and conducted extensive due diligence, none of the purchasers submitted a viable purchase offer to EIT.  EIT was successful in obtaining operating capital loans from PNC, M&T, Maines and the Shareholders during that period; however, notwithstanding the infusion of these funds, the company's revenues continued to decline and significantly impair EIT's ability to operate. During the past year, EIT has attempted to restructure its financial situation by reducing expenses and making other operational adjustments, including laying off a significant number of employees.  These adjustments, however, have not produced the required amount of relief. Absent chapter 11 relief, EIT projects that it will not have sufficient cash flow to continue its operations past September 30, 2013.

16.    The Debtors are in the process of negotiating an Asset Purchase Agreement with a stalking horse purchaser for all of the Debtors' assets, and anticipate filing motions seeking approval of the bidding procedures and sale within one week following the Petition Date.  The Debtors anticipate that the proposed purchaser will continue to operate the printed circuit board manufacturing business at EIT's Binghamton, New York facility.  The asset purchase agreement will be subject to higher and better offers and to the approval of this Court.

2165168.3 7/10/2013

### B.    Transportation

17.    Transportation is a Delaware limited liability company, and a subsidiary of EIT,

formed in 2008 with a principal office and place of business at 1093 Clark Street, Endicott, New

York 13760.  Transportation was formed for the purpose of acquiring a corporate jet to meet the

considerable transportation needs of EIT personnel.  Effective March 10, 2008, Transportation

entered into an Aircraft Lease Agreement with Canal Air, pursuant to which Canal Air agreed to

purchase a Raytheon Aircraft Company, 2007 Model Hawker 800XP jet aircraft, including

airframe, engines and all appurtenant equipment (collectively, the "Aircraft") and lease it to

Transportation pursuant to the terms of an Aircraft Lease Agreement.  EIT guaranteed

Transportation's obligations under the Aircraft Lease Agreement pursuant to a Corporate

Guaranty dated March 10, 2008.

18.    On October 25, 2012, Canal Air sent a Notice of Event of Default to

Transportation and EIT alleging that Transportation failed to make a monthly payment due under

the Aircraft Lease Agreement due on October 12, 2012.  On November 7, 2012, Canal Air

commenced an action against Transportation and EIT in the United States District Court for the

Southern District of New York (Case No. 12-cv-8080) alleging breach of contract and seeking to

recover damages in the sum of $11,511,940.00 (the "Canal Air Action")[7].  On March 25, 2013,

Canal Air commenced an action against Transportation and EIT in the United States District

Court for the Northern District of New York (Case No. 13-cv-334) seeking an Order (i)

enjoining Transportation from using the Aircraft, (ii) awarding specific performance against

Transportation under the Aircraft Lease Agreement, and (iii) authorizing Canal Air to recover the

Aircraft.  This action was transferred to the Southern District of New York (as Case No. 13-cv-

2686) by Order dated April 22, 2013.  Canal Air subsequently recovered the Aircraft from

---

[7] The Complaint was amended on November 26, 2012.

2165168.3 7/10/2013

Transportation pursuant to an Order of Replevin and Preliminary Injunction dated May 9, 2013. The Canal Air Action was stayed upon the filing of the Debtors' petitions for relief.

19.    As of the Petition Date, Transportation was not operating and did not have any employees.

20.    The purpose of the Debtors' chapter 11 filings, therefore, is to ensure the ongoing operations of the manufacturing facility, to address the Debtors' financial difficulties for the benefit of their respective creditors and to market the Debtors for sale through a competitive bidding process.

## PART II - FIRST DAY MOTIONS

**A.    Application for Order Pursuant to Sections 327(a) of the Bankruptcy Code Authorizing the Retention of Bond, Schoeneck & King, PLLC as Attorneys for the Debtors and Debtors in Possession**

21.    The Debtors have selected the law firm of Bond, Schoeneck & King, PLLC ("BS&K") to act as their attorneys in connection with the prosecution of their chapter 11 cases.

22.    Due to BS&K's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, as well as its specialized and substantial expertise in corporate, litigation, labor and real estate law, I believe that BS&K is highly qualified to assist the Debtors with the intricate legal issues likely to arise in these chapter 11 cases.

23.    Prior to the Petition Date, the Debtors consulted with BS&K with respect to, among other things, the preparation, commencement and prosecution of these cases.  Through such consultations, BS&K has become familiar with the Debtors' businesses and legal affairs. Furthermore, the members and associates of BS&K who will advise the Debtors in these cases have considerable knowledge and experience in the field of bankruptcy law and debtors' and

9

creditors' rights, including insolvencies, restructurings and business reorganizations and

liquidations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related to

these chapter 11 cases.

24.    If retained, BS&K will render the following services, without limitation, on the

Debtors' behalf:

    (a)    advising the Debtors with respect to their powers and duties as debtors and debtors in possession in the continued management and operation of their respective businesses and assets;

    (b)    attending meetings and negotiating with representatives of creditors and other parties in interest and advising and consulting on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11;

    (c)    taking all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions commenced under the Bankruptcy Code on their behalf, and objections to claims filed against the estates;

    (d)    preparing, on behalf of the Debtors, all motions, applications, answers, orders, reports and papers necessary to the administration of the estates;

    (e)    negotiating and preparing, on the Debtors' behalf, chapter 11 plans, disclosure statements and all related agreements and/or documents and taking any necessary action on behalf of the Debtors to obtain confirmation of such plans;

    (f)    advising the Debtors with respect to sales of assets;

    (g)    appearing before this Court, any appellate courts, and the U.S. Trustee, and protecting the interests of the Debtors' estates before such courts and the U.S. Trustee;

    (h)    performing all other legal services in connection with these chapter 11 cases.

25.    BS&K has indicated its willingness to act in these cases as the Debtors' attorneys

and to render the foregoing services.  The Debtors have agreed to pay BS&K compensation on

an hourly basis, plus reimbursement of actual and necessary expenses and other charges incurred

by BS&K. I believe the fees that BS&K will charge the Debtors, as set forth in the Affidavit of

Stephen A. Donato, Esq. to be filed in support of BS&K's retention application, are fair and

reasonable in light of prevailing market rates, both in and out of chapter 11 proceedings, and

BS&K's extensive experience and the scope of the work to be performed pursuant to this

retention.

26.    I believe that BS&K is well qualified to represent the Debtors as debtors in

possession in these chapter 11 cases and that the retention of BS&K is necessary and in the best

interests of the Debtors, their estates and their creditors.  Accordingly, the Debtors respectfully

request that the Court issue an Order approving the appointment of BS&K to act as the attorneys

to the Debtors herein.

**B.**    **Motion for Order Authorizing (A) Maintenance of Existing Bank Accounts, (B)
        Continued Use of Existing Cash Management Systems, (C) Continued Use of
        Existing Business Forms and (D) Authorizing Continued Intercompany
        Transactions**

27.    A list of the Debtors' respective bank accounts (collectively, the "Bank

Accounts") is provided in the Motion of the Debtors for Entry of an Order Authorizing (A)

Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Cash Management

System, (C) Continued Use of Existing Business Forms and (D) Authorizing Continued

Intercompany Transactions dated July 10, 2013 (the "Bank Account Motion").  The Bank

Accounts include a loan account at PNC Bank, operating, payroll and executive accounts at

M&T Bank and a cash clearing account at JP MorganChase Bank (PNC, M&T and JP

MorganChase Bank are collectively, the "Banks")

28.    The Bank Accounts and the Debtors' practices and procedures with respect to the collection of deposits, making disbursements and making payroll constitute the Debtors' cash management systems (the "Cash Management Systems"). The Cash Management Systems enable the Debtors to monitor collection and disbursement of funds, and maintain control over the administration of their bank accounts, all of which facilitate the effective collection, disbursement, and movement of cash.

29.    As of the Petition Date, the Debtors will instruct the Banks to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of those checks to employees for wages and/or employee benefits, as described more fully in the Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Pay Prepetition Compensation and Reimbursable Employee Benefits, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefit Programs dated July 10, 2013 (the "Employee Wage Motion").

30.    Pursuant to the standard chapter 11 operating practice in this jurisdiction, the Debtors are required, among other things, to open new bank accounts upon the filing of the bankruptcy petitions and are further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.

31.    The Debtors' existing Cash Management System is essential to the ordinary coordination of the Debtors' businesses. The Debtors submit that the cost and expense of changing the Bank Accounts and creating a new cash management system would not only force the Debtors to incur significant and unnecessary costs and expenses, but would impair the operation of the Debtors' businesses.

2165168.3 7/10/2013

32.    Indeed, forcing the Debtors to employ new cash management systems could cause confusion, diminish the prospects for a successful reorganization, disrupt payroll and introduce inefficiency at a time when efficiency is most critical, and place a strain on the Debtors' relationships with customers and vendors.  Naturally, these relationships must be maintained if the Debtors are to be given the opportunity to operate successfully.  Asking the Debtors' various commercial and government customers to remit payments to new and different accounts will result in a slowdown in the Debtors' collection of receipts just at the time when prompt collection of much-needed cash is most critical.

33.    Further, the preservation of the Bank Accounts will not adversely impact any of the Debtors' creditors.  The Debtors will work with the Office of the United States Trustee to ensure that the Bank at which the Debtor's operating, payroll and credit card accounts are located are designated as Authorized Depositories.

34.    The Debtors seek to prohibit and enjoin the Banks from honoring all prepetition checks, except as expressly set forth herein.  As noted above, and in the Employee Wage Motion, filed contemporaneously herewith, the Debtors request that the Court direct the Banks to continue honoring payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued.  Such relief is necessary to implement, to the extent granted, and shall be subject to, the relief requested by the Debtors in the Employee Wage Motion.  The Debtors intend to provide notice of entry of the order granting the Bank Account Motion to the Banks within one (1) business day of the entry of such an order.

35.    The Debtors also request permission to use their existing business forms and stationery without alteration or change.  The Debtors do not print their own business forms and stationery.  Thus, substantial time and expense would be required if the Debtors were required to

13

print new business forms and stationery merely to indicate "debtor in possession". The Debtors also intend to execute new signature cards with respect to its Bank Accounts to indicate "debtor in possession", and will also stamp all checks "DIP" or "Debtor in Possession" postpetition.

36.    Finally, in the ordinary course of their businesses, the Debtors utilize a cost allocation system by which payroll and other relevant expenses are allocated between EIT and its subsidiary, EI Technologies UK, Ltd. (the "Intercompany Transactions"). As a result of the Intercompany Transactions, intercompany receivables and payables are created in the ordinary course of business (the "Intercompany Claims").[8] The Intercompany Transactions are sometimes settled by book entry rather than by an actual transfer of cash. EIT tracks all Intercompany Transactions in its accounting system and can ascertain, trace and account for them as needed. Continuing these Intercompany Transactions and other intercompany services will benefit the Debtors' estates. If the Intercompany Transactions were to be discontinued, the Cash Management Systems and related administrative controls would be disrupted to EIT's and EI Technologies UK, Ltd.'s detriment.

37.    The Debtors submit that "cause" exists to waive the investment and deposit restrictions under section 345(b) of the Bankruptcy Code to the extent that the Debtors' cash management deposits and investments do not comply. The financial institutions at which the Debtors maintain their Bank Accounts are financially stable banking institutions and are FDIC insured (up to the applicable unit per account). All such deposits and investment are prudent and designated to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments.

---

[8] EIT engages in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to EIT. The Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code. Nonetheless, out of an abundance of caution, EIT seeks express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring EIT's ability to operate its business as a debtor in possession.

2165168.3 7/10/2013

38.    The Debtors believe that the deposit and investment of their cash in the PNC, M&T and JP MorganChase Bank Accounts provides the protection required by section 345(a) of the Bankruptcy Code, notwithstanding the absence of a "corporate surety" requirement. The requirement of obtaining a bond secured by the undertaking of a corporate surety from such a financial institution would be prohibitively expensive and administratively burdensome, and could offset any of the financial gain derived from investing in private as well as federal or federally-guaranteed securities.

39.    The Debtors submit that sufficient cause exists under section 345(b)(2) of the Bankruptcy Code to allow the Debtors to deviate from the approved investment practices otherwise required. Accordingly, the Debtors respectfully request authority to deposit and invest funds in a safe and prudent manner in accordance with its existing Cash Management Systems and past practice.

40.    Based upon all of the foregoing, the Debtors submit that sufficient cause exists to allow the Debtors to maintain its existing bank accounts, cash management system and business forms, and to continue to effect Intercompany Transactions with respect to payroll and furniture purchases, and respectfully requests that they be authorized to continue using their current cash management systems and business forms during the post-petition period.

**C.    Motion for Entry of an Order Authorizing the Debtors to (A) Pay Prepetition Compensation and Reimbursable Employee Benefits, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefit Programs**

41.    To avoid the significant risks of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtors be granted authorization requested in the Employee Wage Motion. The Debtors require the continued service of their employees in order to ensure that the

2165168.3 7/10/2013

continuity and quality of its business operations will not be threatened and so that the Debtors

may continue, without unnecessary interruption, their efforts to achieve successful outcomes for

the chapter 11 cases.

42.    EIT currently employs 570 full-time employees and nine (9) part-time employees

(collectively, the "Employees").  All of the Employees are paid bi-weekly, in arrears, on Fridays.

The average weekly gross payroll for the Employees is approximately $1,194,934.00.  As

discussed in Section II(B) above, EIT maintains a payroll account at M&T.

43.    As of the Petition Date, the accrued, unpaid payroll for all Employees was

approximately $1,009,065.00.  The next regularly-scheduled pay date for all Employees is July

12, 2013.  All of the wages earned by the Employees prior to the Petition Date constitute

prepetition wages which will be paid on July 12.  Therefore, it is imperative that the Debtors

obtain authorization to pay priority prepetition wage claims to all of their Employees on or

before July 12, 2013.

44.    No Employee is currently owed amounts that exceed the $12,475.00 cap on

priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

45.    Accordingly, the Employee Wage Motion seeks authority to pay accrued but

unpaid prepetition wages, salaries and commissions due all Employees through the Petition Date.

The Debtors seek to pay the wages, salaries and commissions for all Employees in the ordinary

course when the first obligations come due on July 12, 2013, including obligations that are not

yet due.

46.    In addition, in the ordinary course of their businesses, the Debtors provide

benefits to their Employees (collectively, the "Employee Benefits").  The Employee Benefits to

2165168.3 7/10/2013

Employees include, without limitation, vacation leave, sick leave, 401(k) plan, health insurance, life insurance, workers' compensation, disability insurance, and related programs.

47.    The accrued pre-petition payroll and Employee Benefits owed is less than $12,475.00 for each Employee in all circumstances.

48.    The Debtors further request that this Court authorize the Banks to process, honor and pay all prepetition checks issued by, and fund transfer requests made from, the Debtors with respect to Employee wages, salaries, commissions and Employee Benefits that were not processed, honored or paid as of the Petition Date.

49.    Finally, the Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include Social Security, FICA, federal, state, and local income taxes, 401(k) contributions, garnishments, health care payments and charitable donations.  Such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  I respectfully submit that the Debtors' practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtors are seeking authority to continue such practice.

50.    The obligations for which the Debtors seek authorization to honor to their Employees were earned by individuals employed by the Debtors, and are for services rendered within one hundred and eighty (180) days before the commencement of the Debtors' cases.  The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

51.    The relief requested pursuant to the Employee Wage Motion will not prejudice creditors, but rather will protect their interests.

2165168.3 7/10/2013

**D.**    **EIT's Emergency Application and Order (1) Authorizing Limited Use of Cash Collateral and Providing Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, and (2) Scheduling Interim and Final Hearings Concerning Use of Cash Collateral**

52.    EIT and Integrian, M&T and Maines have entered into an Emergency Order (a) authorizing limited use of cash collateral pursuant to section 363 of the Bankruptcy Code, (b) authorizing the Debtor to grant adequate protection to the lenders pursuant to sections 361 and 363 of the Bankruptcy Code, and (c) scheduling an interim hearing and a final hearing concerning the Stipulation pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Stipulation"). EIT seeks to use the cash collateral of Integrian, M&T and Maines, which arises in accordance with the transactions described in paragraph 12 above and herein:

  **i.**    **The Integrian Revolving Line of Credit Obligation**

53.    On February 10, 2012, EIT executed and delivered the PNC Revolver to PNC, pursuant to which PNC made a line of credit available to EIT in the amount of $50,000,000.00. Repayment of the amounts loaned under the PNC Revolver was secured by the first position PNC Lien upon the Prepetition Collateral and was guaranteed by Transportation, among other entities. The Prepetition Collateral consists of all of EIT's personal property, including machinery, equipment, furniture, fixtures, inventory, accounts, chattel paper, deposit accounts, insurance claims, proceeds and contractual rights relating to such inventory, including EIT's cash collateral.

54.    PNC duly filed a UCC-1 financing statement with the New York State Secretary of State in February 2012.

55.    On March 6, 2013, Integrian paid PNC the full value of the then outstanding balance due under the Revolver Note in the amount of $3,954,385.54 and PNC assigned all of its right, title and interest under the Revolver Note to Integrian.

18

56.     As of the Petition Date, the approximate principal sum of $4,981,262.19, plus accrued interest totaling $1,149.42, and costs and expenses, was owed to Integrian under the Revolver Loan Documents.

**ii.     The M&T/Integrian Term Note**

57.     On March 13, 2013, certain of the Matthews family members borrowed $6,405,000.00 from M&T.  Matthews thereafter loaned the sum of $6,405,000.00 to Integrian pursuant to a Term Note and Credit Agreement dated March 13, 2013.  Integrian subsequently loaned the sum to EIT pursuant to a Term Note and Credit Agreement dated March 18, 2013.  EIT and Integrian executed and delivered to M&T Continuing Guarantees dated March 13, 2013 (the "Guarantees") in connection with that transaction.  A portion of the funds totaling $1,405,000.00 were paid to M&T to satisfy EIT's obligations under certain equipment leases, and the balance of $5,000,000.00 was used by EIT as working capital.

58.     M&T/Integrian holds a perfected first-priority security interest in the Prepetition Collateral.  As of the Petition Date, the approximate principal sum of $6,084,750.000, plus accrued interest totaling $17,113.36 and costs and expenses, was owed to M&T/Integrian under the Integrian Term Note.

**iii.     The Maines Term Note**

59.     On June 13, 2013, EIT executed and delivered to William Maines and David Maines a Term Note, Security Agreement and Subordination Agreement pursuant to which the Maines loaned to EIT the sum of $5,000,000.00.  Repayment of the amount loaned under the Maines Loan Documents is secured by a second position security interest and lien covering the Prepetition Collateral.

2165168.3 7/10/2013

60.    The Maines duly filed a UCC-1 financing statement with the New York State Secretary of State in June 2013 which perfected their security interest in the Prepetition Collateral.

61.    As of the Petition Date, the principal sum of $5,000,000.00, plus accrued interest totaling $9,895.83 and costs and expenses, was owed to the Maines under the Maines Loan Documents.

### iv.    EIT's Need to Use Cash Collateral

62.    It is my belief that EIT requires the use of cash collateral to fund its day-to-day operations.  Indeed, absent such relief, EIT's business will be brought to an immediate halt, with disastrous consequences for EIT, its estate and creditors.  Accordingly, EIT seeks authority pursuant to section 363(c)(2) of the Bankruptcy Code to use the Prepetition Cash Collateral in the operation of its business and administration of its chapter 11 case.  EIT has not been able to obtain, in the ordinary course of its business, unsecured credit under section 503(b)(1) of the Bankruptcy Code as an administrative expense sufficient to meet its operating needs.

63.    In order to adequately protect the Prepetition Secured Lenders' interest in the Cash Collateral, the Debtors are proposing to continue to make regular principal and interest payments to certain of the Prepetition Secured Lenders in accordance with the applicable provisions of the Prepetition Loan Documents and to grant each of the Prepetition Secured Lenders, in accordance with their relative priority, Adequate Protection Liens to secure the Adequate Protection Obligations.

64.    EIT has received consent from M&T, Integrian and the Maines in the form of the Emergency Order: (A) Authorizing the Debtors' Cash Collateral, (B) Granting Adequate Protection Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, and (C) Scheduling

2165168.3 7/10/2013

Interim and Final Hearings for Approval of the Debtors' Continued Use of Cash Collateral (the

"Cash Collateral Stipulation") submitted to the Court herewith.

65.    In sum, without immediate access to the Prepetition Cash Collateral, EIT faces a

liquidity crisis that would threaten the viability of its business.  If cash is not available to

maintain business-as-usual operations during the critical period immediately following

commencement of this case, EIT will likely face a substantial, if not devastating, loss of

customer support and other irreparable harm from a severe tightening or elimination of trade

credit, delayed deliveries, loss of hundreds of employees and employee morale and deteriorating

relationships with suppliers and customers – all of which would adversely affect the value of

EIT's business.  Thus, EIT's ability to remain a viable operating entity and preserve value

pending the orderly liquidation of its estate, depends upon obtaining the interim and final relief

requested in the Cash Collateral Stipulation.

**E.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay
Prepetition Taxes and Regulatory Fees**

66.    I have reviewed the Motion of the Debtors for Entry of an Order Authorizing the

Debtors to Pay Prepetition Taxes and Regulatory Fees (the "Tax Motion").  Based upon my

review of the Tax Motion, I understand that the Debtors seek an Order from the Court

authorizing, but not directing, them to pay prepetition sales, use, payroll, trust fund and other

taxes and federal, state and local regulatory fees and licensing fees (collectively, "Taxes and

Fees") to the respective authorities in the ordinary course of the Debtors' businesses.  Nothing

contained in the Tax Motion, however, would preclude the Debtors from contesting, in their sole

discretion, the validity and amount of any prepetition Taxes or Fees under bankruptcy or non-

bankruptcy law.

2165168.3 7/10/2013

67.    The Debtors, in the ordinary course of their businesses, incur various tax liabilities, including Taxes and Fees.  The Taxes and Fees are paid to various taxing authorities (collectively, the "Taxing Authorities") on a periodic basis that is established for each particular tax.

68.    As of the Petition Date, the Debtors believe that they are generally current with respect to the payment of Taxes except that (i) certain sales and use taxes may be owed to New York State with respect to non-manufacturing goods purchased by the Debtors for which the vendor did not collect the applicable tax[9] and (ii) certain Taxes may have accrued prepetition but not yet come due for payment.

69.    As of the Petition Date, the Debtors estimate that they have an outstanding balance due of approximately $9,647.00 relating to prepetition Regulatory Fees and Licensing Fees.

70.    I am informed that the Debtors generally do not have any legal or equitable interest in funds held to pay Taxes and Fees.  Moreover, to the extent that these "trust fund" taxes and other amounts are collected from third parties and held for payment to the Taxing Authorities, I am informed that they are not property of the estate.  The Debtors, therefore, generally have no equitable interest in funds collected and segregated to pay the Sales and Use Taxes.

71.    Prior to the Petition Date, the Debtors paid the Taxes and Fees as they became due to Taxing Authorities.  Nothing contained in the Tax Motion should be construed as impairing, or should be deemed to impair, the Debtors' right to contest the validity or amount of

---

[9]  The Debtors are currently the subject of an audit by the New York Department of Taxation and Finance to determine the amount of sales and use taxes that the Debtors may owe.

22

any Taxes and Fees that may be alleged to be due; and the Debtors expressly reserve all of their rights with respect thereto.

72.     Further, I am informed that most, if not all, of the Taxes and Fees are entitled to priority status under the Bankruptcy Code.  The Debtors' payment of the Taxes and Fees in the ordinary course of business, in all likelihood, will only affect the timing of the payments and not the amounts to be received by such entities.  Therefore, I do not believe that other creditors and parties in interest will be prejudiced by such payment.

73.     Without question, I believe that the payment of the Taxes and Fees is necessary to avoid interruption of the Debtors' respective business activities.  The withholding of the payment of the Taxes and Fees likely would cause taxing and other authorities to conduct audits and other administrative proceedings, resulting in significant administrative burdens.  Prompt and regular payment of the Taxes and Fees will avoid these unnecessary government actions.

74.     Furthermore, authority to pay the Taxes and Fees is necessary to avoid subjecting the Debtors' officers and directors to lawsuits during the pendency of this proceeding that would distract from the effort to successfully conclude a sale of EIT's assets and wind down the Operations of Transportation.  Many federal and state statutes provide that various Taxes and Fees constitute "trust fund" taxes for which officers and directors of the collecting entity may in certain circumstances be held personally liable.  To the extent any accrued Taxes and Fees were unpaid as of the Petition Date, the taxing and other authorities in such jurisdictions may attempt to enforce such personal liability provisions against certain of the Debtors' officers and directors. Such potential actions would prove extremely distracting for the Debtors, and for the named officers and directors whose immediate and full-time attention to the Debtors' operations is

required.  I believe it is in the best interests of the Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions.

75.    I believe that granting the relief requested will enhance the likelihood of the successful liquidation of the Debtors and the probability of maximizing the value of estate assets and, ultimately, the return to creditors.  Further, I believe that the timely payment of the Taxes and Fees is necessary, is in the best interests of the Debtors' estates and is highly beneficial to the operation of the Debtors' businesses.  Accordingly, the Debtors seek authority to pay, in their sole discretion, the Taxes and Fees to the relevant Taxing Authorities in the ordinary course of business.

**F.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Honor Prepetition Insurance Premium Financing Agreement and (B) Enter Into New Premium Financing Agreements in the Ordinary Course of Business**

76.    I have reviewed the Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Honor Prepetition Insurance Premium Financing Agreement and (B) Enter Into New Premium Financing Agreements in the Ordinary Course of Business.  I believe that, if the requested relief is not granted and the Insurance Programs (discussed below) lapse or terminate, the Debtors will be unable to continue their business operations, thereby endangering the Debtors' on-going operations and substantially harming all creditors.

77.    In the ordinary course of the Debtors' businesses, they maintain numerous insurance policies providing coverage for, among other things, general liability, medical products, errors and omissions, liability, automobile liability, aviation, crime, errors and omissions, pollution, property, director and officer liability, and workers compensation as well as umbrella coverage (collectively, the "Insurance Policies") through several private insurance carriers (the "Insurance Carriers").  All of the Insurance Policies referenced above are discussed

more fully in the Insurance Motion and are essential to the on-going operation of the Debtors'
businesses.

78.     The aggregate cost of the annual premiums for the Debtors' Insurance Policies is
approximately $1,425,782.00.  It is not always economically advantageous for the Debtors to pay
the premiums on all of the Insurance Policies on a lump-sum basis.  Accordingly, in the ordinary
course of the Debtors' business, the Debtors finance the premiums on some of their Insurance
Policies by entering into premium finance agreements with premium finance companies such as
AFCO Credit Corporation ("AFCO").

79.     Prior to the Petition Date, the Debtors financed the premiums for Insurance
Policies providing coverage for general liability, automotive liability, excess liability, property,
aviation, workers compensation as well as umbrella coverage by making a cash down payment to
AFCO in the amount of $262,128.00 and financing the remaining $1,048,511.50 of premiums.
In exchange for the financing, the Debtors agreed to pay nine (9) monthly installment payments
including a total finance charge of $11,733.05, representing an annual interest rate of 2.678%.  In
addition, the Debtors granted AFCO a security interest in return premiums and certain loss
payments to secure their payment obligations.

80.     If the Debtors are not able to pay the Finance Obligations, AFCO may seek relief
from the automatic stay to terminate the Insurance Policies in order to recoup their losses.  The
Debtors would then be required to obtain replacement insurance on an expedited basis and at
tremendous cost to the Debtors' estates.  If the Debtors were required to obtain replacement
insurance and pay a lump-sum premium in advance, this payment would likely be greater than
what the Debtors currently pay.  Even if AFCO were not permitted to terminate the Insurance
Policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability

2165168.3 7/10/2013

to obtain new policies or finance premiums in the future. In view of the importance of

maintaining insurance coverage with respect to their business activities and the preservation of

the Debtors' cash flow and estates by financing the insurance premiums, the Debtors believe it is

in the best interests of their estates to authorize the Debtors to honor their Financing Obligations.

Any other alternative would likely require considerable additional cash expenditures and would

be detrimental to the Debtors' reorganization efforts.

81.    In addition, because the Agreement will likely expire during the course of these

Chapter 11 Cases, the Debtors seek authority to renew the Agreement or to enter into similar

replacement agreements in the ordinary course of their business, without further Court approval.

The Debtors will need to continue their insurance coverage throughout the entire duration of

these Chapter 11 Cases. The Debtors respectfully submit that renewal of the Agreement falls

squarely within their ordinary course of business, and, but for the constraints of section 364 of

the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the

Agreement. To reduce the administrative burden, as well as the expense of operating as debtors

in possession, the Debtors seek the Court's authority now to renew the Agreement or enter into

new similar agreements if and when necessary.

82.    The nature of the Debtors' businesses and the extent of their operations make it

essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted

basis. The nonpayment of any premiums, deductibles or related fees under the Insurance

Programs could result in one or more of the Insurance Carriers terminating or declining to renew

its insurance policies or refusing to enter into new insurance policies with the Debtors in the

future. If the Insurance Programs lapse without renewal, the Debtors could be exposed to

2165168.3 7/10/2013

substantial liability for personal and/or property damages, to the detriment of all parties in interest.

83.     In order for the Debtors to maintain their operations in compliance with various legal and contractual obligations, the Debtors must be able to continue their Insurance Programs without disruption.  In addition, as directed by the Office of the United States Trustee for the Northern District of New York, debtors in chapter 11 cases have a fiduciary obligation and a legal duty to account for their operations of a business, which in part is met "substantially" by "obtaining and maintaining insurance" following the Petition Date.  The continuation of the Insurance Programs and the payment of all prepetition and post-petition Insurance Obligations arising under the Insurance Programs are therefore essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.  I therefore respectfully request that the Court grant the relief requested in the Insurance Motion in its entirety.

[Signature Page Follows]

2165168.3 7/10/2013

I swear, under penalty of perjury under the laws of the United States of America, that the

foregoing is true and correct to the best of my knowledge, information and belief.


_____

David W. Van Rossum


Sworn to before me this
___ day of July, 2013.


Notary Public

CATHERINE RINGWOOD
Notary Public, State of New York
No. 4829716
Residing in Broome County
My commission expires June 30, 20 15