UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

ENDICOTT INTERCONNECT TECHNOLOGIES, INC.,[1]

Case No.  13-61156
Chapter 11 Case

Debtor.

**[PROPOSED] DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S
CHAPTER 11 PLAN OF LIQUIDATION DATED DECEMBER 20, 2013**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING
SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE
BANKRUPTCY COURT.**

**BOND, SCHOENECK & KING, PLLC**
*Attorneys for Debtor*
*Endicott Interconnect Technologies, Inc.*
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202
Tel: (315) 218-8000
Fax: (315) 218-8100

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Endicott Interconnect Technologies, Inc. (2350) and EI Transportation Company, LLC (4961).

2240313.3

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     GENERAL BACKGROUND, THE CHAPTER 11 CASE AND RELATED ISSUES ........ 4

III.    FINANCIAL INFORMATION ............................................................................... 9

IV.     THE CHAPTER 11 PLAN OF LIQUIDATION .......................................................... 9

        A.    Classification of Claims ............................................................................ 10

        B.    Treatment of Classified Claims ................................................................. 10

              1.    Class 1 – FSB Mortgage Claims ..................................................... 10
              2.    Class 2 – Administrative Expense Claims ....................................... 11
              3.    Class 3 – Priority Claims ................................................................ 11
              4.    Class 4 – General Unsecured Claims .............................................. 11

        C.    Equity Interests ........................................................................................ 12

        D.    Methods of Distribution Under the Plan .................................................... 12

              1.    Objection Deadline ......................................................................... 12
              2.    Authority to Oppose Claims and Prosecute Estate Causes of Action ................... 12
              3.    No Distributions on Disputed Claims Pending Allowance ................ 13
              4.    No Distribution in Excess of Amount of Allowed Claim .................. 13
              5.    Determination by Bankruptcy Court ................................................ 13
              6.    Unclaimed Property/Unclaimed Personal Property .......................... 13
              7.    Third Party Agreements; Subordination .......................................... 13
              8.    Transmittal of Distributions and Notices ......................................... 14
              9.    Disputed Payment ........................................................................... 14
              10.   Withholding Taxes and Expenses of Distribution ............................ 14
              11.   Method of Cash Distributions ......................................................... 14
              12.   Fractional Cents/De Minimis Payment ............................................ 14
              13.   Distributions on Non-Business Days ............................................... 14

        E.    Executory Contracts and Unexpired Leases ............................................... 15

              1.    Rejection of Executory Contracts ................................................... 15
              2.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
                    Unexpired Leases Rejected Pursuant to the Plan .............................. 15

        F.    Causes of Action ..................................................................................... 15

        G.    Discharge, Injunction and Release ............................................................ 15

              1.    Discharge and Release .................................................................... 15

2240313.3

i

2.  Full Satisfaction ................................................................................ 16

3.  Injunction Through Effective Date ...................................................... 16

4.  Exculpation ........................................................................................ 16

5.  Permanent Injunction ......................................................................... 17

6.  Binding Effect .................................................................................... 17

H.  Effective Date of the Plan .......................................................................... 17

V.  MEANS FOR IMPLEMENTATION OF THE PLAN .......................................... 17

A.  Implementation of the Plan ........................................................................ 17

1.  Distribution Sources and Methods ...................................................... 17

2.  Persons Authorized to Implement Plan ............................................... 18

3.  Cancellation of Equity Interests ......................................................... 18

4.  Dissolution of Creditors' Committee ................................................... 18

5.  Dissolution of Corporate Entities ....................................................... 18

B.  Summary of Other Provisions of the Plan .................................................. 18

1.  Modifications to the Plan .................................................................... 18

2.  Severability ........................................................................................ 18

3.  Governing Law ................................................................................... 19

VI.  REQUIRED VOTES ........................................................................................ 19

VII.  ACCEPTANCE AND CONFIRMATION OF THE PLAN .................................... 20

A.  Confirmation Hearing ................................................................................ 20

B.  Objections to Confirmation ........................................................................ 20

C.  Requirements for Confirmation of the Plan ................................................ 20

D.  Reservation of "Cram Down" Rights .......................................................... 21

VIII. INCOME TAX CONSEQUENCES ................................................................... 21

A.  Consequences to the Debtor ....................................................................... 22

B.  Consequences to the Holders of Unsecured Claims .................................... 23

1.  Gain or Loss ....................................................................................... 23

2.  Distribution in Discharge of Accrued Interest or OID ......................... 24

3.  Information Reporting and Withholding .............................................. 24

IX.  ALTERNATIVES TO THE PLAN ..................................................................... 24

1.  Consequences of Liquidation by a Chapter 7 Trustee ......................... 25

2.  Dismissal ........................................................................................... 25

2240313.3

X.    CONCLUSION AND RECOMMENDATION ................................................................. 25

2240313.3

# I.      INTRODUCTION

On July 10, 2013 (the "Petition Date"), Endicott Interconnect Technologies, Inc. (the "Debtor") filed a voluntary petition for relief pursuant to chapter 11 of title 11, U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"). The case was filed in the Utica, New York Division of the Bankruptcy Court and assigned case number 13-61156.

An Official Committee of Unsecured Creditors (the "Committee") was duly appointed by the Office of the United States Trustee (the "U.S. Trustee") on July 19, 2013.

This Disclosure Statement (the "Disclosure Statement") is being provided by the Debtor to all of the known Creditors and parties in interest of the Debtor pursuant to § 1125 of the Bankruptcy Code. Its purpose is to provide such information as may be deemed material, important and necessary to the Creditors to make a reasonably informed decision in exercising their right to vote for acceptance of the Chapter 11 Plan of Liquidation filed by the Debtor on December 20, 2013 (the "Plan"). The Plan, a summary of which is included herein, specifies the Classes of the Debtor's Creditors and the treatment of the Claims thereof.

On _____, 2014, the Bankruptcy Court issued an Order approving this Disclosure Statement and setting a time and date for a hearing on the acceptance of the Plan. A Creditor may vote on the Plan by filling out and mailing an acceptance form to counsel for the Debtor at the address stated herein. In general, words or phrases used in this Disclosure Statement shall have their usual and customary meaning. Capitalized terms defined in the Plan and used in this Disclosure Statement that are not otherwise defined in this Disclosure Statement shall have the meanings attributed to them in Article I of the Plan. A copy of the Plan accompanies this Disclosure Statement.

The Plan is a plan of liquidation with regard to all of the Debtor's Assets. As discussed more fully below, on October 31, 2013, substantially all of the Debtor's Assets were sold to Integrian Holdings, LLC pursuant to an Order issued by the Bankruptcy Court. All of the information contained herein is derived from the Debtor's books and records. Although every effort has been made by the Debtor to present complete and accurate information, no representation or warranty is made that all of the information contained in this Disclosure Statement is completely free of inaccuracies.

## Your Right to Vote

Upon approval of this Disclosure Statement, a ballot form will be sent to you for the purposes of voting which contains instructions for properly completing and returning it in a timely fashion.

A Creditor, in order to be entitled to vote on the Plan, must have filed a Proof of Claim form on or before the January 6, 2014 claims bar date established in this Chapter 11 Case unless its Claim is scheduled by the Debtor as not disputed, liquidated and not contingent. Any Creditor whose Claim has already been accurately scheduled by the Debtor as not disputed, liquidated and not contingent is, to the extent and in the amount scheduled, deemed Allowed. A

Creditor may vote to accept or reject the Plan by filling out and returning the ballot which has been provided.

The Bankruptcy Court has fixed the date set forth in the Notice accompanying this Disclosure Statement as the last date by which ballots must be received. No ballot received after that date will be counted. Whether a Creditor votes on the Plan or not, such Creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of the Classes of Creditors and/or is confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, such Creditor's Claim will not be included in the totals. Allowance of a Claim for voting purposes, and disallowance of any Claim for voting purposes, does not necessarily mean that all or a portion of the Claim will be allowed or disallowed for distribution purposes.

In order for the Plan to be accepted by Creditors, a majority in number and two-thirds in amount of Claims filed and allowed (for voting purposes) and voting in each impaired Class of Claims must vote to accept the Plan. You are, therefore, urged to fill in, date, sign and promptly return the enclosed ballot. Please be sure to properly complete the form and legibly identify the name of the Creditor.

The information contained in this Disclosure Statement has been derived from sources which are believed to be reliable, including primarily, the records of the Debtor, but have not been independently verified nor subjected to audit. Every reasonable effort has been made to present accurate information, however, due to the complexity of the Debtor's affairs, the accuracy of the information cannot be guaranteed. Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents which are either on file with the Bankruptcy Court or can be made available upon request. While every effort has been made to retain the meaning of such other documents or the portions referenced, please be cautioned that any reliance on the contents of such other instruments should depend on a thorough review of the documents themselves.

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information under the particular circumstances. Approval of the Disclosure Statement does not constitute an endorsement or recommendation of the Plan by the Bankruptcy Court. The information contained in this Disclosure Statement was provided by the Debtor. Although the Debtor has done its best to assure that this Disclosure Statement is correct and complete, it is impossible to represent that the information contained in this Disclosure Statement is without error.

Votes on the Plan may not be solicited unless a copy of this Disclosure Statement is furnished prior to or concurrently with such solicitation. NO REPRESENTATIONS CONCERNING THE DEBTOR, PARTICULARLY AS TO THE VALUE OF ITS ASSETS OR THE AMOUNT OF ANY DISTRIBUTIONS MADE UNDER THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT, ARE AUTHORIZED. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT ARE NOT AUTHORIZED, AND SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS OR

2240313.3

INDUCEMENTS SHOULD BE REPORTED TO BOND, SCHOENECK & KING, PLLC
(STEPHEN A. DONATO, ESQ.) ATTORNEYS FOR THE DEBTOR, ONE LINCOLN
CENTER, SYRACUSE, NEW YORK 13202, (315) 218-8000, ARENT FOX, LLP (ROBERT
M. HIRSH, ESQ.) ATTORNEYS FOR THE COMMITTEE, 1675 BROADWAY, NEW YORK,
NEW YORK 10019, (212) 484-3900, AND TO GUY A. VAN BAALEN, ESQ., ATTORNEY
FOR THE UNITED STATES TRUSTEE, 105 U.S. COURTHOUSE, 10 BROAD STREET,
UTICA, NEW YORK 13501, (315) 793-8191, WHO IN TURN SHALL DELIVER SUCH
INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE
DEEMED APPROPRIATE.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY
PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NOTHING
CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION IN ANY PROCEEDING
OR ACTION, OR BE DEEMED TO BE ADVICE ON THE TAX OR LEGAL EFFECT OF
THE PLAN ON ANY HOLDER OF A CLAIM. THIS DISCLOSURE STATEMENT WAS
COMPILED FROM INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER,
NEITHER A CERTIFIED AUDIT NOR INDEPENDENT APPRAISAL WAS PERFORMED
BY THE DEBTOR. THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF
CERTAIN PROVISIONS OF THE PLAN. WHILE THE DEBTOR BELIEVES THAT THE
SUMMARY IS FAIR AND ACCURATE, SUCH SUMMARY IS QUALIFIED TO THE
EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.
REFERENCE IS HEREBY MADE TO THE PLAN FOR A COMPLETE STATEMENT OF
THE TERMS AND PROVISIONS THEREOF. IF ANY INCONSISTENCIES EXIST
BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL
CONTROL.

THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE MADE AS
OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED IN THIS
DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT
SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT
THERE HAS BEEN NO CHANGE IN ANY FACTS SET FORTH IN THIS DISCLOSURE
STATEMENT SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF
CREDITORS WHOSE CLAIMS AGAINST THE DEBTOR'S ESTATE ARE IMPAIRED
UNDER THE PLAN, TO ENABLE SUCH CREDITORS TO MAKE AN INFORMED
DECISION IN VOTING ON THE PLAN.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND/OR
ADVERSELY CHANGE THE TREATMENT OF CLASSES MAY BE MADE TO THE PLAN
PRIOR TO CONFIRMATION WITHOUT FURTHER SOLICITATION. SUCH
AMENDMENTS MAY BE APPROVED BY THE COURT AT THE CONFIRMATION
HEARING WITHOUT ENTITLING MEMBERS OF ANY CLASSES WHOSE TREATMENT
IS NOT ADVERSELY CHANGED TO WITHDRAW ANY VOTES TO ACCEPT OR
REJECT THE PLAN.

2240313.3

THIS DISCLOSURE STATEMENT SUMMARIZES THE PLAN.  FOR A
DEFINITIVE UNDERSTANDING OF THE TERMS OF THE PLAN, THE DEBTOR
RECOMMENDS THAT YOU REVIEW THE PLAN ITSELF AND CONSULT YOUR
ATTORNEY AND/OR TAX PROFESSIONAL.

## II.    GENERAL BACKGROUND, THE CHAPTER 11 CASE AND RELATED ISSUES

### A.    General Background

On July 10, 2013, the Debtor filed a voluntary petition for relief pursuant to chapter 11 of
the Bankruptcy Code with the Bankruptcy Court.  The Debtor is a closely-held New York
corporation with a former principal office and place of business located at 1093 Clark Street,
Endicott, New York 13760.  The Debtor was formed in 2002 as the successor to IBM
Corporation's microelectronics division in Endicott, New York (formed in 1966).  The Debtor
was a world-wide supplier of advanced electronic packaging solutions for industrial,
commercial, medical, government and telecommunications customers.  It designed and
fabricated printed circuit (PC) boards and advanced flip chip and wire bond semiconductor
packages, including systems-in-packages, offered full turnkey services for PC board and
integrated circuits assembly and tests and provided systems integration.  Its flip chip package
products were widely used in applications such as avionics and controls, medical devices,
electronic warfare, network-centric systems, intelligence and surveillance systems, anti-
counterfeiting and anti-tamper technologies, space and airborne systems, sensor systems,
unmanned systems, radio frequency systems and homeland security.  The Debtor designed,
manufactured, tested and delivered printed circuit board fabrications, semiconductor packaging
fabrications and complex assembly products from its facility in Endicott, New York.  Its primary
customers included IBM, Cadence, Cisco, Boeing, Northrop Grumman, Raytheon, St. Jude
Medical, GE Medical, Harris, DE Shaw and the U.S. Department of Defense.

On the Petition Date, the Debtor was owned by Judith Matthews, the Estate of James F.
Matthews, James T. Matthews, Douglas G. Matthews, John W. Matthews, Robert P. Matthews
and Lawrence Davis (collectively, the "Shareholders").  The Debtor, in turn, is the corporate
parent of four (4) subsidiary corporations:  EI Transportation Company, LLC ("Transportation"),
Endicott Medtech, Inc., EI Technologies UK, Ltd. and EI Asia Pacific, Ltd.  Transportation also
filed a voluntary chapter 11 petition for relief on July 10, 2013.[2]  Transportation, Endicott
Medtech, Inc. and EI Asia Pacific, Ltd. are not currently operating and do not have significant
assets.  Two sales employees residing in England were paid their salaries and commissions
through a payroll account established by EI Technologies UK, Ltd.

On the Petition Date, the Debtor was indebted to secured creditors Integrian Holdings,
LLC ("Integrian"), as successor in interest to PNC Bank, National Association ("PNC"), M&T
Bank ("M&T"), the holder of a contingent secured claim, and William and David Maines
("Maines", and together with Integrian and M&T, the "Prepetition Secured Lenders"), pursuant
to the following transactions and documents (collectively, the "Prepetition Loan Documents"):

---

[2] Transportation's case was jointly administered with the Debtor's case pursuant to Orders Granting Joint
Administration of Cases dated July 10, 2013.  Transportation's assets were also sold to Integrian on October 31,
2013 and a motion to dismiss Transportation's chapter 11 case will be filed with the Bankruptcy Court.

2240313.3

a.        On February 10, 2012, the Debtor executed and delivered a Revolving Credit Note and Revolving Credit and Security Agreement (together with all related transaction documents, the "PNC Revolver") to PNC, pursuant to which PNC made a line of credit available to the Debtor in the amount of $50,000,000.00. Repayment of the amounts loaned under the PNC Revolver was secured by a first position security interest and lien (the "PNC Lien") upon substantially all of the Debtor's assets (the "Prepetition Collateral") and was guaranteed by Transportation, among other entities. On March 6, 2013, Integrian as successor in interest to PNC, obtained a complete assignment of the PNC Revolver by paying PNC the full amount of the outstanding balance due under the PNC Revolver in the amount of $3,954,385.54 and PNC assigned all of its right, title and interest under the PNC Revolver to Integrian. As of the Petition Date, the Debtor's obligations owed to Integrian as successor in interest to PNC under the PNC Revolver included approximately $4,981,262.19 in unpaid principal, together with accrued interest in the amount of $1,149.42.

b.        On March 13, 2013, certain members of the Matthews family[3] borrowed $6,405,000.00 from M&T. On that same day, the Matthews loaned the sum of $6,405,000.00 to Integrian pursuant to a Term Note and Credit Agreement dated March 13, 2013. Integrian, in turn, loaned the sum to the Debtor pursuant to a Term Note and Credit Agreement dated March 18, 2013 (the "Integrian Term Note"). The loan to the Mathews was guaranteed by, among others, the Debtor and Transportation, and the Debtor granted to M&T a security interest covering all of the Prepetition Collateral. A portion of the funds totaling $1,405,000.00 were paid to M&T to satisfy the Debtor's obligations under certain equipment leases, and the balance of $5,000,000.00 was used by the Debtor as working capital. Repayment by the Debtor of the $6,405,000.00 loaned under the Integrian Term Note is secured by the first position security interest granted to Integrian, as successor in interest to PNC. As of the Petition Date, the Debtor's obligations under the Integrian Term Note included approximately $6,084,750.00 in unpaid principal, together with accrued interest in the amount of $17,113.36 and certain fees, expenses and other amounts due.

---

[3] James T. Mathews, Douglas G. Mathews, Theresa Mathews, John W. Mathews and Robert P. Mathews (collectively, the "Mathews").

2240313.3

      c.      On June 13, 2013, Maines loaned the sum of $5,000,0000.00 to the Debtor for working capital purposes pursuant to a Term Note (the "Maines Term Note"), Security Agreement and Restated and Amended Subordination Agreement (the "Subordination Agreement") dated as of June 13, 2013 (collectively, the "Maines Loan Documents"). Repayment of the Maines Term Note is secured by a second position security interest and lien covering all of the Debtor's personal property. Under the terms of the Restated and Amended Subordination Agreement, repayment of the amounts due Integrian under the PNC Revolver are subordinated to the repayment of the Maines Term Note. As of the Petition Date, the Debtor's obligations under the Maines Loan Documents included $5,000,000.00 in unpaid principal, together with accrued interest in the amount of $9,895.83 and certain fees, expenses and other amounts due.

In addition to the foregoing, as of the Petition Date, the Debtor owed approximately $35,000,000.00 on an unsecured basis to non-insider trade creditors, and approximately $32,335,131.27 to the Shareholders and other former shareholders in connection with unsecured loans made by them to the Debtor since 2002. In addition, the Debtor was the tenant under a Real Property Lease Agreement with Huron Real Estate Associates, LLC ("Huron") dated January 1, 2008 pursuant to which it owed Huron $4,494,733.33 for pre-petition rental payments, utility payments and other charges.

Since 2009, the Debtor's revenues declined steadily from a high of $414 million in 2008 to projected revenues of less than $100 million for 2013 as a result of increased competition from foreign circuit board manufacturers, a reduced number of contract opportunities with the federal government due to the sequestration and the general, sustained downturn in the national and international economies. As a result, the Debtor incurred operating losses of nearly $100 million during the period of 2009-2012.

## B.    The Chapter 11 Case

### 1.    First Day Motions and Orders

Following the Petition Date, the Debtor was in possession and control of its assets and business operations as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. On July 10, 2013, in order to preserve its business operations without interruption or damaging discontinuity, the Debtor sought by application or emergency motion, the following relief: (i) entry of an order approving payment of pre-petition taxes, wages and salaries, reimbursement of pre-petition employee business expenses and payment of other pre-petition employee benefits; (ii) entry of an order authorizing the continued maintenance of the Debtor's existing bank accounts, cash management system and use of existing business forms; (iii) entry of an order authorizing payment of pre-petition sales and use taxes; (iv) entry of an order authorizing the Debtor to continue making premium payments to insurance companies, and (v) entry of an order authorizing the use of cash collateral, granting adequate protection and for other relief.

2240313.3

On July 10, 2013 and thereafter, the Court entered Interim and Final Orders, in respect of the above-referenced applications and emergency motions.

## 2.    Schedules and Statement of Financial Affairs

On July 17, 2013, the Debtor filed its detailed schedules of assets and liabilities with the Bankruptcy Court. The Debtor also filed its statement of financial affairs containing various disclosures regarding such affairs on July 17, 2013.

## 3.    Creditors' Committee

On July 19, 2013, the Office of the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors in these Reorganization Cases under § 1102(a) of the Bankruptcy Code. The members of the Creditors' Committee include representatives from Avnet Electronics Marketing, Arrow Electronics, Inc., Acbel Polytech, Inc. Cadence Design Systems, Inc., Orbotech, Inc., Tyco Electronics and High Performance Copper Foil, Inc.

## 4.    Retention and Compensation of Professionals

The Debtor retained, pursuant to orders of the Bankruptcy Court, certain professionals to assist with its Chapter 11 Case. The Debtor's principal legal advisor is Bond, Schoeneck & King, PLLC. The Debtor also retained Davidson Fox & Company, LLP as its general accountants and auditors, and Feather Lane Advisors, LLC to act its financial advisor and business broker.

The Creditors' Committee retained, pursuant to orders of the Bankruptcy Court, Arent Fox LLP as its legal advisor and GlassRatner Advisory and Capital Group, LLC as its financial advisor. The Creditors' Committee actively participated in all aspects of the Chapter 11 Case.

As of December 23, 2013, the Bankruptcy Court has authorized, and the Debtor has paid, $1,165,725.65 to the professionals identified above for their fees and expenses incurred in connection with the Chapter 11 Case.

## 6.    Bar Date

The Court established, in accordance with the applicable Bankruptcy Rules, January 6, 2014 as the last date for filing of proofs of Claim against the Debtor.

## 7.    Cash Collateral

The Bankruptcy Code defines "cash collateral" as cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents acquired at any time. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash collateral unless (1) each entity with an interest in such cash collateral consents or (ii) the bankruptcy court authorizes such use after notice and a hearing. If a debtor's use of cash collateral results in a decrease in value of a creditor's interest in such cash collateral, the debtor must furnish the creditor with "adequate protection". Adequate protection may be in the form of cash payments,

2240313.3

additional or replacement liens, or such other relief that the bankruptcy court determines is necessary to protect the creditor against a decrease in the value of its cash collateral.

As discussed above, the Prepetition Secured Lenders provided pre-petition loans to the Debtor totaling approximately $16,300,000.00. In exchange for those loans, the Debtor granted to the Prepetition Secured Lenders pre-petition security interests in the Debtor's cash and accounts receivable pursuant to which the Prepetition Secured Lenders asserted interests in the Debtor's cash collateral. As of the Petition Date, the aggregate principal amount due and owing to the Prepetition Secured Lenders was approximately $16,100,000.00.

On July 10, 2013, the Debtor filed a motion seeking authorization to use cash collateral generated by its business operations to, among other things, pay its employees, purchase inventory and supplies and fund normal operating expenses. The Bankruptcy Court entered an emergency order authorizing the Debtor to use cash collateral and provide adequate protection on July 10, 2013 and subsequently entered seven (7) interim orders granting the same relief. On November 5, 2013, the Bankruptcy Court entered a Final Order Authorizing the Debtor's Use of Cash Collateral and Granting Adequate Protection Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code.

The obligations owed to the Secured Lenders were satisfied as part of the Asset Sale described below.

## 8.    Sale and Liquidation of the Debtor's Assets

Since 2009, the Debtor explored all available options in an effort to reorganize its financial affairs, including seeking refinancing, new capital contributions and the sale of some assets and/or all of its assets. The Debtor engaged two business brokerage firms, J.P. Morgan Securities LLC and Feather Lane Advisors, LLC, which undertook extensive efforts to market the Debtor's assets and business operations for sale. Although several potential financial and/or strategic purchasers expressed interest in acquiring the Debtor's assets and operations and conducted extensive due diligence, none of the purchasers submitted a viable purchase offer to the Debtor. The Debtor was successful in obtaining operating capital loans from PNC, M&T, Maines and the Shareholders during that period; however, notwithstanding the infusion of these funds, the company's revenues continued to decline and significantly impair the Debtor's ability to operate. During the past year, the Debtor has attempted to restructure its financial situation by reducing expenses and making other operational adjustments, including laying off a significant number of employees. These adjustments did not produce the required amount of relief.

On August 23, 2013, the Bankruptcy Court entered an order approving (i) an auction sale of the Assets; (ii) the applicable bidding procedures, (iii) the form of the sale notice, and (iv) procedures for assuming and assigning executory contracts and unexpired leases [Docket No. 236]. The Debtor thereafter received four (4) purchase offers for the Assets from qualified bidders, and on September 24, 2013, conducted an auction sale of the Assets. Integrian emerged as the successful bidder at the conclusion of the auction sale process, and the Court approved the sale of the Assets to Integrian pursuant to an Order dated October 3, 2013 [Docket No. 353]. Integrian's Asset Purchase Agreement was thereafter amended pursuant to an Amendment to

2240313.3

Asset Purchase Agreement dated October 31, 2013 [Docket No. 396]. The Asset sale to Integrian closed effective as of October 31, 2013.

The purchase price paid by Integrian under the Asset Purchase Agreement, as amended, is composed of the following:

(i)      a credit bid of $1,000,000;

(ii)     the assumption by Integrian of the Integrian Term Note;

(ii)     the assumption by Integrian of the Maines Term Note;

(iii)    the creation of an Administrative Expense Reserve in the approximate amount of $2,113,000.00;

(iv)    the assumption by Integrian of "Priority Vacation Obligations" owed to the Debtor's employees for vacation benefits accrued during the 180-day period of January 10, 2013 through July 9, 2010 as allowable under section 507(a)(4) of the Bankruptcy Code, but only to the extent such benefits remain unused or unpaid as of October 31, 2013; and

(v)     the execution of the Estate Note in the amount of $850,000.00

The Administrative Expense Reserve, the proceeds of the Estate Note and any other assets the Debtor may recover will be available for distribution to creditors in this Chapter 11 Case.

## III.    FINANCIAL INFORMATION

The Debtor's assets are comprised of the following:

1.    <u>Administrative Claim Reserve</u>: Cash remaining totaling approximately $400,000.00 designated to pay Allowed Administrative Expense Claims.

2.    <u>Estate Note</u>: Promissory note in the principal amount of $850,000.00.

3.    <u>Other Property</u>: Other cash or assets recovered by the Debtor that may become property of the Debtor's estate.

## IV.    THE CHAPTER 11 PLAN OF LIQUIDATION

THE FOLLOWING SUMMARIZES THE PLAN. CREDITORS ARE URGED NOT TO RELY ON THIS SUMMARY AND, INSTEAD, TO READ CAREFULLY THE FULL TEXT OF THE PLAN. WHEN CONFIRMED, THE PLAN WILL BE BINDING UPON THE COMMITTEE, THE DEBTOR, ITS CREDITORS AND OTHER AFFECTED PARTIES. THE PLAN PROVIDES FOR THE LIQUIDATION OF THE DEBTOR'S ESTATE.

2240313.3

## A.    <u>Classification of Claims</u>

The Plan divides all Claims into Classes.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class, and is classified in other Classes to the extent that any remainder of the Claim qualifies within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been disallowed, paid or released prior to the Effective Date.

As set forth in § 1124 of the Bankruptcy Code, a Claim is Impaired unless the Plan: (i) leaves unaltered the legal, equitable and contractual rights of such Claim, or (ii) provides for the reinstatement of such Claim.

## B.    <u>Treatment of Classified Claims.</u>

The Plan provides for the following division of Creditors:

> Class 1 – Administrative Expense Claims
> Class 2 – Priority Claims
> Class 3 – General Unsecured Claims
> Class 4 – Existing Equity Interests

### 1.    <u>Class 1 – Administrative Expense Claims.</u>

(a)    <u>Treatment</u>.  Class 1 consists of holders of Allowed Administrative Expense Claims.  All of the Class 1 Claims remaining to be paid in the Chapter 11 Case consist of (i) the Professional Fee Claim of Bond, Schoeneck & King, PLLC, counsel to the Debtor, which the Debtor estimates will total approximately $50,000.00 through the closing of the Chapter 11 Case, (ii) quarterly fees due the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (iii) all Allowed Section 503(b)(9) Claims estimated to total approximately $26,000.00, (iv) all post-Petition Date tax claims of governmental units, and (v) all credit, advances and/or loans provided to, and/or debts incurred by, the Debtor after the Petition Date in the ordinary course of the Debtor's business.

Allowed Class 1 Administrative Expense Claims will be paid in full, in cash, on or before the Effective Date or, if incurred after the Effective Date, as they are incurred.  Each holder of an Administrative Expense Claim in this Class shall be paid with priority as set forth in § 507(a)(1) of the Bankruptcy Code an amount not to exceed the full amount of its Claim prior to any Distribution to any holder of a Claim in Classes 2 or 3.  No payment shall be made to any claimant in this Class until the Claim has been fixed and allowed by final and non-appealable order of the Court.

(b)    <u>Impairment and Voting</u>.  Class 1 Claims are not Impaired and shall not be entitled to vote to accept or reject the Plan.  Accordingly, the Class 1 Claim holders are deemed to have accepted the Plan.

2240313.3

2.      **Class 2 – Priority Claims.**

(a)      <u>Treatment</u>.  Class 2 consists of Creditors holding Allowed Priority Claims. Integrian has assumed the Priority Vacation Claims asserted by former employees of the Debtor totaling $392,918.91 have been assumed by Integrian.  The balance of the Priority Vacation Claims totaling $30,467.07 will be paid by the Debtor.

In addition, on December 12, 2013, the New York State Department of Taxation and Finance filed a proof of Claim in the Chapter 11 Case pursuant to which it assets a Priority Claim in the amount of $901,900.92 for unpaid sales taxes due for the periods ending August 31, 2012, November 30, 2012, February 28, 2013 and May 31, 2013.  This Claim is currently the subject of an audit being undertaken by the Department of Taxation and the Debtor estimates that the audit process will conclude during March 2014.  The Debtor disputes the amount asserted, and estimates that the amount due will total $500,000.00 or less.

Each holder of an Allowed Class 2 Claim shall be paid in full in installments with priority as set forth in § 507(a) of the Bankruptcy Code, as funds are received under the Estate Note, prior to any distribution to any holder of a Claim in Class 3.  No payment shall be made to any claimant in this Class unless, however, and until (i) all Class 1 Claims have been paid in full, and (ii) the Priority Claim has been fixed and allowed by a Final Order of the Bankruptcy Court or determined to be undisputed, liquidated and not contingent.  The Class 2 Claim shall be paid without interest.

(b)      <u>Impairment and Voting</u>.  Class 2 Claims are Impaired and shall be entitled to vote to accept or reject the Plan.

3.      **Class 3 – General Unsecured Claims.**

(a)      <u>Treatment</u>.  Class 3 consists of all holders of General Unsecured Claims against the Debtor.  Based upon its review of the Debtor's Schedules and the Claims Register maintained by the Bankruptcy Court in connection with the Chapter 11 Case, the Debtor estimates that the Class 3 Claims may total approximately $35,000,000.00, which amount may include unsecured claims asserted by trade vendors and customers in the approximate amount of $30,000,000.00, **[a deficiency claim asserted by Integrian under the  in the amount of $3,981,262.19]** and contract and lease rejection claims totaling approximately $7,500,000.00.[4]

---

[4] The deadline by which counter-parties to rejected contracts and leases must file claims for rejection damages is January 19, 2014.

2240313.3

The pre-petition loans made by the Debtor's current and former shareholders to the Debtor totaling approximately $32,000,000.00 will be subordinated to the Allowed Class 3 Claims pursuant to section 510(c) of the Bankruptcy Code and will not be paid in this Chapter 11 Case.

(b)    Distribution. The Debtor estimates that, after paying the Claims in Classes 1 and 2, a portion of the proceeds of the Estate Note will be available to distribute to the holders of Allowed Class 3 General Unsecured Claims. At this time, the Debtor estimates that the holders of Allowed Class 3 Claims will receive a distribution equal to 1%-2% of their Allowed Claims. Payment of the Allowed Class 3 Claims will be funded from the proceeds of the Estate Note and will be paid in annual installments over five (5) years. The Class 3 General Unsecured Claims shall be paid without interest. No payment shall be made to any claimant in this Class unless and until (i) all Class 1 and 2 Claims have been paid in full; and (ii) such General Unsecured Claim has been fixed and allowed by a Final Order of the Bankruptcy Court or determined to be undisputed, liquidated and not contingent.

(c)    Impairment and Voting. Class 3 Claims are Impaired and therefore are entitled to vote to accept or reject the Plan.

**4.    Class 4 - Existing Equity Interests.**

(a)    Treatment. All Class 4 existing equity interests will be extinguished and cancelled on the Effective Date and will receive no distribution in this Chapter 11 Case.

(b)    Impairment and Voting. The Class 4 holders of existing equity interests have been deemed to reject the Plan, and therefore will not be entitled to vote to accept or reject the Plan.

**C.    Methods of Distribution Under the Plan**

Subject to Bankruptcy Rule 9010, the Debtor will make all payments or distributions under the Plan from proceeds of the Administrative Expense Reserve or Estate Note, where applicable, to holders of Allowed Claims at their last known addresses, which shall be presumed to be as set forth on the proof of claim filed by each such Claimant, or if no proof of claim was filed, on the Schedules filed by the Debtor, as may have been amended from time to time, unless a Claimant shall have supplied a new or corrected address in writing to the Debtor within two (2) weeks prior to a distribution to permit the Debtor to revise its records accordingly.

**1.    Objection Deadline.** As soon as practicable, but in no event beyond sixty (60) days after the Effective Date, unless otherwise authorized by the Bankruptcy Court upon *ex parte* motion by the Debtor (the "Objection Deadline"), the Debtor shall file objections to Claims with the Bankruptcy Court and serve such objections upon the holders of each of the Claims to which objections are made, upon consultation with the Creditors' Committee.

**2.    Authority to Oppose Claims and Prosecute Estate Causes of Action.** Subject to (a) consultation with the Committee, and (b) all necessary approvals from the Bankruptcy Court, the Debtor shall have the exclusive privilege of objecting to, disputing, defending against, and otherwise opposing, and the making, asserting, filing, litigation, settlement or withdrawal of

2240313.3

all objections to Claims. The Debtor shall have the power to preserve, fail to preserve, settle, compromise or litigate any claim or cause of action (except for any claims or causes of action released or to be released pursuant to or in connection with the Plan) before any applicable or appropriate court, panel, agency or tribunal (including, where appropriate, the Bankruptcy Court) that the Debtor may have against any Person based on acts, omissions or events prior to the Effective Date. The Debtor shall continue to retain the services of Bond, Schoeneck & King, PLLC, which shall be paid for services rendered during the post-Confirmation period by the Debtor's estate.

3.      **No Distributions on Disputed Claims Pending Allowance.** Notwithstanding any other provision in the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Disputed Claim unless and until such Claim or becomes an Allowed Claim consistent with the Plan.

4.      **No Distribution in Excess of Amount of Allowed Claim.** Notwithstanding anything to the contrary herein, no holder of an Allowed Claim or Allowed Administrative Expense Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim. Except as otherwise expressly provided herein, no Claim or Administrative Expense Claim shall be Allowed to the extent it is for post-petition interest.

5.      **Determination by Bankruptcy Court.** The amount of any Disputed Claim, and the rights of the holder of such Claim, if any, to payment in respect thereof shall be determined by the Bankruptcy Court, unless it shall have sooner become an Allowed Claim.

6.      **Unclaimed Property/Unclaimed Personal Property.** If any distribution remains unclaimed for a period of sixty (60) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. The holder of the Allowed Claim previously entitled to such unclaimed property shall cease to be entitled thereto, and such property shall, to the extent practicable in the Debtor's sole discretion, be redistributed to the holders of Allowed Claims pursuant to the Plan.

7.      **Third Party Agreements; Subordination.** Except as set forth herein, distributions to the various Classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach or employ any other legal process with respect to such distributions by reason of any claimed contractual subordination rights, or otherwise. Distributions made by the Debtor shall not be inconsistent with such contractual subordination provisions and may be modified only by a Final Order directing that distributions be made other than as provided in the Plan and Confirmation Order; provided, however, that the Debtor (or any of their agents, members, representatives, professionals or employees) shall be liable to any Entity on account of distributions which are ultimately determined to be inconsistent with inter-creditor contractual subordination agreements or rights, unless such distributions were made in bad faith or with malicious intent.

2240313.3

8.    **Transmittal of Distributions and Notices.**

(a)    Any property or notice which an Entity is or becomes entitled to receive pursuant to the Plan may be delivered by regular mail, postage prepaid, in an envelope addressed to that Entity at the address indicated on any notice of appearance filed in this Chapter 11 Case by that Entity or his authorized agent prior to the Effective Date.  If no notice of appearance has been filed, notice shall be sent to the address indicated on a properly filed proof of claim or, absent such a proof of claim, the address set forth in the relevant Schedule of Assets and liabilities for that Entity.  Property distributed in accordance with this section shall be deemed delivered to such Entity regardless of whether such property is actually received by that Entity.

(b)    A holder of an Administrative Expense Claim or Claim may designate a different address for notices and/or distributions by notifying the Debtor in writing of that address. Any change of address of a party entitled to receive distributions hereunder must be provided to the Debtor by registered mail in order to be effective.  Such notification shall be effective upon receipt by the Debtor.

9.    **Disputed Payment.**  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Debtor may, in lieu of making a distribution to such Entity, make such distribution into a Disputed Claims Reserve until the disposition thereof shall be determined by Bankruptcy Court order or by written agreement among the interested parties to such dispute.  The Debtor shall have no liability if it acts in accordance with this section.

10.    **Withholding Taxes and Expenses of Distribution.**  No federal, state or local withholding taxes or other amounts will be withheld or deducted from distributions made pursuant to the Plan.  All Entities holding Claims and receiving distributions under the Plan are responsible for paying to the appropriate taxing authority the required amounts as defined in the applicable tax codes.

11.    **Method of Cash Distributions.**  Any Cash payment to be made by the Debtor pursuant to the Plan will be in U.S. dollars and will be made by check.

12.    **Fractional Cents/De Minimis Payment.**  When any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of less than $0.50 and rounding up in the case of $0.50 or more); provided, however, that in no event will an amount less than $1.00 be distributed.  Any remaining unpaid amount in the Debtor's estates at the conclusion of the Chapter 11 Case will be disbursed in accordance with § 6.6 of the Plan.

13.    **Distributions on Non-Business Days.**  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

2240313.3

## D.    Executory Contracts and Unexpired Leases

1.    **Rejection of Executory Contracts**.  To the extent that any executory contract or unexpired lease remains which has not been expressly assumed and assigned to a third party, such executory contract and lease shall be deemed rejected.

2.    **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**.  Unless otherwise ordered by the Court, any creditor whose Claim arises from the rejection of an executory contract or unexpired lease shall have thirty (30) days from (i) the entry of an order authorizing the Debtor to reject the contract or lease, or (ii) if the contract or lease is rejected as part of the Plan, the service upon them of a copy of the Confirmation Order, to file a Proof of Claim with the Bankruptcy Court regarding such rejection.  To the extent such Claim becomes an Allowed Claim, any such person shall have the rights of a Class 3 Claimant with respect thereto.  If such Proof of Claim is not filed within the time specified herein, it shall be forever barred from assertion against the Debtor or its property.

## E.    Causes of Action

In accordance with section 2.1(i) of the Asset Purchase Agreement, Integrian acquired all Causes of Action owned by the Debtor as against third parties.  Consequently, the Debtor will not pursue any such claims or Causes of Action in this Chapter 11 Case.

## F.    Discharge, Injunction and Release

1.    **Discharge and Release**.  On the Effective Date, the Debtor, the Committee, the Committee's members, their respective employees, officers, directors, attorneys and agents, and their respective Assets and properties will be discharged and released from any debt, charge, liability, encumbrance, security interest, lien, assignment, Claim, interest, or other Cause of Action of any kind, nature or description (including, but not limited to, any claim of successor liability) that arose before the Effective Date, and any debt of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of claim is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has voted on the Plan including, without limitation, liabilities arising under environmental laws in respect of the Debtor, or any of the Debtor's successors or assigns or their respective Assets or properties, which result, in whole or in part, from any condition, event, occurrence or happening prior to the Effective Date, whether known or unknown, discovered or undiscovered, asserted or unasserted, latent or patent, and regardless of whether any Claim was, is, or could have been asserted for such liability, and upon such discharge and release, no such liabilities shall be obligations, liabilities, claims, liens or encumbrances against the Debtor, and the Assets, whether under the doctrine of successor liability or otherwise.

Nothing in the Debtor's bankruptcy proceedings, Confirmation Order, Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Chapter 11 Case shall in any way be construed to discharge, release, limit, or relieve the Debtor or any other party, in any capacity, from any liability or responsibility with respect to the Pension Plan or any other defined benefit pension plan under any law, governmental policy or regulatory provision.

2240313.3

The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code or any other document filed in the Chapter 11 Case.

In addition, nothing in the Debtor's bankruptcy proceedings, Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties.

2.      **Full Satisfaction.**  Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by the Plan, the distributions and rights that are provided in the Plan will be in complete satisfaction, discharge and release, effective as of the Effective Date of (i) all Claims and Causes of Action against, liabilities of, liens on, charges, encumbrances, security interests, obligations of and interests in the Debtor, the Assets, or the direct or indirect Assets and properties of the Debtor, whether known or unknown, and (ii) all Causes of Action, whether known or unknown, either directly or derivatively through the Debtor, or the successors and assigns of the Debtor based on the same subject matter as any Claim or any other interests, in each case, regardless of whether a proof of Claim was filed, whether or not Allowed, and whether or not the holder of the Claim has voted on the Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim, in each case regardless of whether a Proof of Claim form was filed, whether or not Allowed and whether or not the holder of the Claim has voted on the Plan.

3.      **Injunction Through Effective Date.**  Except as expressly provided for in the Plan, all injunctions, liens or stays entered in the Chapter 11 Case and existing immediately before the Effective Date will remain in full force and effect until the Effective Date.

4.      **Exculpation.**  The Debtor, the Committee and their respective counsel, present and former members, officers, directors, representatives, employees, advisors, attorneys and agents acting in such capacity shall have no liability whatsoever to any holder or purported holder of an Administrative Expense Claim or Claim for any act or omission specifically in connection with, or arising out of, the Plan, this Disclosure Statement, the negotiation of the Plan, the pursuit of approval of this Disclosure Statement or the solicitation of votes for confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or this Disclosure Statement or in furtherance thereof, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects, shall be entitled to rely upon the advice of

2240313.3

counsel with respect to their duties and responsibilities under the Plan. This Exculpation clause shall not be effective concerning the conduct of the Chapter 11 Case generally.

Nothing in this section shall (i) be construed to exculpate any entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, misuse of confidential information that causes damages, or *ultra vires* acts or (ii) limit the liability of the professionals of the Debtors and the Committee to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8, Rule 1.8(h)(1) (2009).

**5.    Permanent Injunction.**

(a)    Except as expressly provided for in the Plan, all Entities are precluded and permanently enjoined from asserting against: (i) the Debtor and/or (ii) the officers, members, directors and shareholders thereof, and/or (iii) the respective Assets and property of any of the foregoing, any Claim, which is discharged pursuant to § 8.1 or § 8.6, or satisfied pursuant to § 8.2, of the Plan.

(b)    Scope of Release and Injunction Hereunder.  The injunction provisions set forth in § 8.5 of the Plan and the release provisions set forth in § 8.1 of the Plan, only release and enjoin prosecution of (a) any Claims discharged under § 8.1 or § 8.6 of the Plan, (b) Claims satisfied under § 8.2 of the Plan and (c) Claims and Causes of Action which are released, cancelled or compromised by the Debtor pursuant to § 6.2 of the Plan, as set forth therein.

**6.    Binding Effect.**  On the Effective Date, according to § 1141 of the Bankruptcy Code, the provisions of the Plan will bind the Debtor, the Committee, any Entity acquiring Assets under the Plan, and any holder of a Claim, whether or not the Claim is Impaired under the Plan and whether or not the holder of the Claim has accepted the Plan.

**G.    Effective Date of the Plan**

The Effective Date of the Plan shall occur automatically upon the filing by the Debtor of a Notice of Confirmation stating that the conditions set forth below have been satisfied:

1.    The Confirmation Order shall have been entered; and

2.    The Confirmation Order shall be unstayed and shall have become a Final Order;

## V.    MEANS FOR IMPLEMENTATION OF THE PLAN

**A.    Implementation of the Plan.**  The Plan will be implemented as follows:

**1.    Distribution Sources and Methods.**  The Cash required to fund Distributions to be made to Claimants under the Plan will be funded from (i) the Proceeds contained in the Administrative Expense Reserve, (ii) the Estate Note and (iii) any other assets that may be recovered on behalf of the Debtor's estate.

2240313.3

2.    **Persons Authorized to Implement Plan.**  Upon confirmation, the Debtor and Bond, Schoeneck & King, PLLC, as counsel to the Debtor, shall be empowered and authorized to (i) act as the disbursing agents for all Distributions to be made under the Plan, and (ii) perform all acts and to execute all documents and instruments necessary to implement and fully consummate the Plan.  Any shareholders of the Debtor or members of its Board of Directors who act under this section shall not be paid for their services but will be allowed an administrative expense claim for reasonable out-of-pocket expenses.  The Debtor's Chief Restructuring Officer will continued to be paid from the Administrative Expense Reserve in accordance with the terms of the Amendment to Asset Purchase Agreement.  Bond, Schoeneck & King, PLLC shall be paid in accordance with the Court's orders relating to its appointment and payment.

3.    **Cancellation of Equity Interests.**  All Existing Equity Interests will be cancelled and terminated on the Effective Date.  In the unlikely event, however, that asset remain after payment in full of the Creditor claims ("Excess Proceeds"), such Excess Proceeds shall be paid by the Debtor to the Class 4 Existing Equity Interests.

4.    **Dissolution of Creditors' Committee.**  The Committee appointed in the Chapter 11 Case will continue to exist and function until the Effective Date, and will be dissolved and disbanded on the Effective Date.  Counsel for the Committee will waive all fees incurred after November 1, 2013 in connection with its representation of the Committee; however, such counsel will be permitted to seek reimbursement from the Debtor's estate for all reasonable expenses incurred on behalf of the Committee through the Effective Date.

5.    **Dissolution of Corporate Entity.**  Following the entry of Orders closing the Chapter 11 Case, the Debtor's representatives shall, in their discretion, take any and all steps deemed necessary to properly dissolve the Debtor's corporate entity.

B.    **Summary of Other Provisions of the Plan.**

1.    **Modifications to the Plan**

The Debtor, with the consent of the Committee, reserves its right, according to the Bankruptcy Code, to amend or modify the Plan before its substantial consummation.  After the Effective Date, the Debtor may, upon order of the Bankruptcy Court, and according to § 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.  A Claimant that has accepted or rejected the Plan will be deemed to have either accepted or rejected, as the case may be, the Plan as modified or amended, even if the modifications or amendments are made after the solicitation of votes of acceptance or rejection of the Plan, unless the Bankruptcy Court orders that such Claimant may change its previous vote within a time established by the Bankruptcy Court for such change to be made.

2.    **Severability**

Each provision of the Plan shall be considered severable.  If, for any reason, any provision or provisions in the Plan are determined to be invalid or contrary to any existing or future law, the balance of the Plan will be given effect with out relation to the invalid provision.  However, any such alteration or interpretation must be in form and substance acceptable to the

2240313.3

Debtor. In the event of any such holding, alteration or interpretation that is acceptable to the Debtor, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**3.    Governing Law**

The rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof, except to the extent that the Bankruptcy Code or other federal law applies. To the extent, however, that New York law is in conflict with ERISA regarding the Pension Plan and any laws arising thereunder, New York law is preempted.

## VI.    REQUIRED VOTES

SECTION 1126(c) OF THE BANKRUPTCY CODE PROVIDES THAT AN IMPAIRED CLASS OF CLAIMS ACCEPTS A PLAN IF IT IS ACCEPTED BY CREDITORS HOLDING TWO-THIRDS IN AMOUNT AND ONE-HALF IN NUMBER OF ALLOWED CLAIMS OF SUCH CLASS THAT HAVE ACCEPTED OR REJECTED THE PLAN.

IN THE EVENT THAT THE PLAN IS NOT ACCEPTED BY ANY IMPAIRED CLASS OF CREDITORS OR IMPAIRED CLASS OF INTERESTS, THE DEBTOR WILL ATTEMPT CONFIRMATION OF THE PLAN IN ACCORDANCE WITH THE PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.

As stated, one criterion for confirmation of the Plan by the Bankruptcy Court is the requisite acceptance of the Plan by each impaired class of Claimants. A ballot for the purpose of voting on the Plan is being forwarded to each Creditor who has timely filed a proof of claim with the Bankruptcy Court (with the exception of these creditors whose Claims were previously disallowed) or whose Claim was scheduled by the Debtor as not disputed, contingent or unliquidated. The ballot of a Creditor whose Claim is the subject of a pending objection is so indicated; such Creditors will not be entitled to vote on the Plan to the extent that their Claims are subject to dispute unless an Order allowing such Claims is entered by the Bankruptcy Court.

In order to accept or reject the Plan, such Creditor must execute the ballot in accordance with the instructions contained therein and return the ballot so as to be received on or before the date indicated on the notice accompanying that ballot to:

2240313.3

Bond, Schoeneck & King, PLLC
Camille W. Hill, Esq.
One Lincoln Center
Syracuse, New York  13202

## VII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.   Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on the confirmation of the Plan (the "Confirmation Hearing").  The Confirmation Hearing is scheduled for **[Insert Date and Time]**, before the Honorable Diane Davis, United States Bankruptcy Judge, United States Courthouse, 10 Broad Street, Utica, New York.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.  The Plan will not be valid until the Bankruptcy Court has entered a Final Order Confirming the Plan.

### B.   Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court and served upon the parties identified in § 11.1 of the Plan by the date set forth in the notice accompanying this Disclosure Statement.  Rule 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 3020-1(a) govern objection to confirmation of the Plan.

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### C.   Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements for confirmation listed in § 1129 of the Bankruptcy Code.  As a condition to confirmation of the Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or further financial reorganization beyond that proposed in the Plan, unless such liquidation or reorganization is proposed in the Plan.  As stated above, the Plan contemplates the complete liquidation of the Debtor.

Section 1124 of the Bankruptcy Code provides that a class of Claims is deemed "Impaired" under a chapter 11 plan unless, in general, the rights of the holders of the Claims of such class are not altered or, with respect to a Claim, the holder receives cash equal to the greater of (i) any liquidation preference; or (ii) the redemption price, if either is applicable.  Any class that is deemed Impaired must accept the Plan by the requisite majority before the Plan may be

2240313.3

confirmed unless the Bankruptcy Court finds that pursuant to § 1129(b) of the Bankruptcy Code that the Plan is fair and equitable and does not discriminate unfairly with respect to each impaired class that has rejected the Plan.

The Court must find that each holder of a Claim (i) has accepted the Plan, or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date of the Plan, has a value not less than the amount such holder would receive if the Debtor's estate was liquidated under chapter 7 of the Bankruptcy Code on such date. The proposed Plan provides that the proceeds from the sale of the Purchased Assets will be used to pay the Claims as set forth in the Plan. The Debtor submits that the payments provided for under the Plan are in the best interest of Creditors because it allows them to recover the same percentage of their respective Claims than would be recovered if the Debtor's assets were liquidated by a chapter 7 trustee.

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the Plan has been accepted by each Impaired Class of Claims. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under § 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one entity or any affiliate thereof (as defined in the Securities Act of 1933 and the rules and regulations promulgated thereunder) shall be aggregated and treated as one Allowed Claim in such Class. If the Bankruptcy Court determines that all confirmation requirements under § 1129 of the Bankruptcy Code are satisfied, it will enter an order confirming the Plan.

## D.  Reservation of "Cram-Down" Rights

The Bankruptcy Code permits the Bankruptcy Court to confirm the Plan over the dissent of any Class or Classes of Claims as long as the standards in Section 1129(b) of the Bankruptcy Code are met. This power to confirm the Plan over dissenting Classes – often referred to as "cramdown" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of Claims can block a restructuring that otherwise meets the requirement of the Bankruptcy Code and is in the interest of the other constituents in the Chapter 11 Case.

The Debtor reserves the right to seek confirmation of the Plan, notwithstanding the rejection of the Plan by any Class entitled to vote. In the event a Class votes to reject the Plan, the Debtor will request the Bankruptcy Court to rule that the Plan meets the requirements specified in § 1129(b) of the Bankruptcy Code with respect to such Class, and that the Plan, among other things, is fair and equitable and does not discriminate unfairly against any Class of Claims.

## VIII.  INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain holders of Claims. The following summary does not address the federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Administrative Expense Claims).

2240313.3

The following summary is based on the Internal Revenue Code of 1986, as amended ( the "Tax Code"), existing and proposed Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes or new interpretations of these rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtor has not requested an opinion of counsel with respect to any of the tax aspects of the Plan.  In addition, the Debtor has not requested a ruling from the IRS concerning the federal income tax consequences of the Plan, and the consummation of the Plan is not conditioned upon the issuance of any such ruling.  Thus, no assurance can be given as to the interpretation that the IRS or a court of law will adopt.

This summary does not address state, local or foreign income or other tax consequences of the Plan, not does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts or tax-exempt entities other than the Debtor).

This summary also assumes that the various third-party debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form, and that Claims are held as capital assets.

*Accordingly, the following summary is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to a holder of a Claim.*

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE OR LOCAL TAX LAWS, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **Consequences to the Debtor**

The Debtor was formed as a subchapter S corporation under the Internal Revenue Code.  As a result, all gains or losses sustained by the Debtor are passed to the Shareholders under the applicable section of the Internal Revenue Code.  As a result of the Plan, the amount of the Debtor's outstanding indebtedness will be substantially reduced and the Debtor will realize

2240313.3

22

income equal to the amount of any cancellation of debt ("COD"). The amount of COD, in general, is the excess of (i) the adjusted amount of the indebtedness satisfied over (ii) the amount of the cash paid and the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

As a result of the discharge of Claims pursuant to the Plan, the Debtor is expected to realize significant COD. In light of the subchapter S election, all tax consequences related to the COD will flow through to the Shareholders, individually, and will be treated as part of their respective personal federal tax filings. The Shareholders will be responsible for filing any and all final tax returns on behalf of the Debtor due under the Internal Revenue Code and with the taxing authorities in the various jurisdictions where the Debtor is organized or conducted business.

**B.    Consequences to the Holders of Unsecured Claims**

As discussed in Article IV(B)(3)(b) above, pursuant to the Plan, following the payment of the Class 2 Priority Claims in full, each holder of an Allowed Class 3 General Unsecured Claim shall be paid its Pro Rata Share in an amount not to exceed the full amount of its Allowed Claim. The payment of the Class 3 General Unsecured Claims will be made from the proceeds of the Estate Note. The Class 3 Claims shall be paid without interest. No payment shall be made to any claimant in this Class unless and until (i) all Class 1 and 2 Claims have been paid in full; and (ii) such Unsecured Claim has been fixed and allowed by a Final Order of the Bankruptcy Court or determined to be undisputed, liquidated and not contingent.

Holders of Allowed General Unsecured Claims will receive a share of the remaining liquidation proceeds described above in Cash in amounts not to exceed the Allowed Amounts of their respective Claims.

*The following discussion does not necessarily apply to holders who have Claims in more than one Class relating to the same underlying obligation. Such holders should consult their tax advisors regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.*

**1.    Gain or Loss**

In general, each holder of a General Unsecured Claim against the Debtor will recognize gain or loss equal to the difference, if any, between (i) the "amount realized" by such holder in satisfaction of its Claim (other than amounts, if any, paid in respect of any Claim for accrued but unpaid interest and other than any amounts treated as imputed interest as further described below) and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). A holder's "amount realized" generally will equal the amount of Cash received by such holder. For a discussion of the federal income tax consequences to holders of any Claim for accrued but unpaid interest, see below.

Where gain or loss is recognized by a holder in respect of its Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder

2240313.3

and how long it has been held, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

2.    **Distribution in Discharge of Accrued Interest or OID**

In general, to the extent that any distribution to a holder of a Claim is received in satisfaction of interest or original issue discount ("OID") accrued or amortized during the time such holder held the Claim, such amount will be taxable to such holder as interest income (if not previously included in such holder's gross income). Conversely, a holder will generally recognize a deductible ordinary loss to the extent of any Claim for accrued interest that previously was included in its gross income and that is not paid in full. However, the treatment of unpaid OID that was previously included in income is less clear. The IRS has privately ruled that a holder of a debt obligation in an otherwise tax-free exchange could not claim a current deduction with respect to any unpaid OID. Accordingly, it is possible that, by analogy, a holder of a Claim in a taxable exchange would be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full. *Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for federal income tax purposes.*

3.    **Information Reporting**

Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participates, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's federal income tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

## IX.    ALTERNATIVES TO THE PLAN

Essentially, the Plan calls for the liquidation of the Debtor's estate. The Plan is offered in the belief that it will generate a return to the Creditors in excess of that which would be realized in a chapter 7 liquidation, because under the Plan, the Debtor proposes to satisfy Administrative Expense Claims and the Priority Claims in full, and General Unsecured Claims will be paid from the Proceeds of the Estate Note, as described herein. In addition, the Debtor's estate will save the additional administrative cost that would otherwise be incurred as a result of the re-education of a chapter 7 trustee and new counsel and as a result of the trustee's fee structure established by

2240313.3

§ 326(a) of the Bankruptcy Code.  The savings will pass, dollar for dollar, to the Creditors in this Chapter 11 Case.

There are two alternatives to confirmation of the Plan.  These are:

(1)    conversion of the chapter 11 proceeding to a chapter 7 liquidation; and

(2)    dismissal of the Chapter 11 Case.

Since confirmation of the Plan will eliminate both alternatives, a brief discussion of each alternative is offered.  The Debtor believes the Plan to be in the best interest of Creditors for a number of reasons and thus does not favor any alternative to the Plan.  Accordingly, the Debtor assesses the alternatives as follows to assist creditors in making their decisions:

1.    **Consequences of Liquidation by a Chapter 7 Trustee.**

This Case could be converted to one administered under chapter 7 of the Bankruptcy Code. Conversion of this case to a case under chapter 7 would entail the appointment of a trustee who by necessity will have no familiarity with the Debtor's operations, and who, for a percentage fee, would oversee the distribution of the proceeds of the Debtor's assets to the Creditors.  Due to the additional expense of a trustee's fee, and the hiring of counsel for the trustee who would be unfamiliar with the case, which expenses cannot be accurately quantified at this time, conversion to chapter 7 is viewed as an unnecessary and expensive alternative by the Debtor.

In addition to incurring the aforementioned expenses, the conversion to a chapter 7 liquidation would effectively diminish the return realized by the creditors in satisfaction of their Claims.

2.    **Dismissal**.

Dismissal of the Cases would leave all Creditors free to use state court remedies to attempt to collect their Claims.  This could result in numerous lawsuits to collect debts, to loss of proceeds available for distribution due to defense costs, and to a disorganized liquidation of the Debtor's property and unequal distribution among creditors having similar Claims.

## X.    CONCLUSION AND RECOMMENDATION

The Debtor requests and recommends acceptance of the Plan by all parties affected thereby.  The Debtor believes that the Plan provides the sole mechanism for the holders of the Allowed Claims to receive a substantial recovery on their Claims.

2240313.3

The Debtor believes that confirmation and implementation of the Plan will provide each Creditor with a greater recovery than it would receive if the Debtor were to liquidate and distribute its Assets under chapter 7.  Thus the Debtor recommends that confirmation and implementation of the Plan is the best possible outcome for Creditors and is in their best interests.

[The remainder of this page is intentionally left blank]

2240313.3

Dated:  December 23, 2013
        Syracuse, New York

BOND, SCHOENECK & KING, PLLC
Attorneys for the Debtor

By: _____
    Stephen A. Donato, Esq., of counsel
    (Bar Roll No. 101522)
    Camille W. Hill, Esq., of counsel
    (Bar Roll No. 501876)
    Office and Post Office Address:
    One Lincoln Center
    Syracuse, New York  13202
    Telephone: (315) 218-8000
    Facsimile:  (315) 218-8100
    sdonato@bsk.com
    chill@bsk.com

Dated:  December 23, 2013
        Endicott, New York

ENDICOTT INTERCONNECT
TECHNOLOGIES, INC.

By: _____
    David Van Rossum
    Chief Restructuring Officer

2240313.3

Dated: December 23, 2013
Syracuse, New York

BOND, SCHOENECK & KING, PLLC
Attorneys for the Debtor

By: _____

Stephen A. Donato, Esq., of counsel
(Bar Roll No. 101522)
Camille W. Hill, Esq., of counsel
(Bar Roll No. 501876)
Office and Post Office Address:
One Lincoln Center
Syracuse, New York  13202
Telephone: (315) 218-8000
Facsimile:  (315) 218-8100
sdonato@bsk.com
chill@bsk.com

Dated: December 23, 2013
Endicott, New York

ENDICOTT INTERCONNECT
TECHNOLOGIES, INC.

By: _____

David Van Rossum
Chief Restructuring Officer

2240313.3